243 N.J. Super. 1 (1990)
578 A.2d 381
S.S., PLAINTIFF-RESPONDENT,
v.
E.S., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 13, 1990.
Decided July 17, 1990.
*4 Before Judges KING, SHEBELL and BAIME.
Saverio R. Principato argued the cause for appellant (Saverio R. Principato on the brief).
*5 Michael T. Grimes argued the cause for respondent (Grimes & Grimes, attorneys; Michael T. Grimes on the letter-brief).
The opinion of the court was delivered by BAIME, J.A.D.
Pursuant to section 14 (N.J.S.A. 9:17-51) of the New Jersey Parentage Act (Act) (N.J.S.A. 9:17-38 to -59), the Family Part ordered defendant to undergo Human Leucocyte Antigen (HLA) blood testing to determine whether he was the father of plaintiff's eight-year old child. Under the Act, a refusal to submit to a court ordered blood test gives rise to a presumption that the results would have been unfavorable to the interests of the recalcitrant party. N.J.S.A. 9:17-51d. In addition, "sanctions within the jurisdiction of the court" may be imposed. N.J.S.A. 9:17-51d. Following defendant's refusal to undergo testing, the Family Part entered an order directing that he be incarcerated. Defendant moved for leave to appeal, contending that the Act is unconstitutionally vague. More specifically, defendant argues that the Act is internally inconsistent because it seemingly permits a party to refuse to submit to a blood test, as long as he implicitly agrees to be burdened with a negative presumption, while empowering the court to impose sanctions upon his assertion of his right to decline testing. Defendant also claims that court ordered blood testing intrudes upon his right to privacy under the Fourth Amendment.
We granted leave to appeal in order to consider defendant's challenges to the constitutionality of the Act. Based upon our review of the statute, we are thoroughly convinced that the language employed does not suffer from constitutional vagueness. We are persuaded, however, that a court ordered blood test constitutes a significant invasion into a party's privacy interests and, therefore, qualifies as a search subject to the Fourth Amendment's reasonableness requirement.

*6 I.
The salient facts can be summarized briefly. Plaintiff S.S. filed a complaint alleging that defendant E.S. is the father of her child, born July 3, 1981. It is undisputed that before the present action plaintiff had instituted paternity proceedings against two other individuals. Plaintiff conceded on the record that these prior actions were frivolous and that she knew neither of these men was the father.
Pursuant to plaintiff's request, the Family Part ordered defendant to undergo an HLA blood test under N.J.S.A. 9:17-51. That section provides as follows:
a. The court may, and upon request of a party shall, require the child, mother, or alleged father to submit to blood tests or genetic tests. The tests shall be performed by a qualified expert appointed by the court.
b. The court, upon reasonable request by a party, shall order that independent tests be performed by other qualified experts.
c. The court shall determine the number and qualifications of the experts.
d. The refusal to submit to blood tests or genetic tests, or both, may be admitted into evidence and shall give rise to the presumption that the results of the tests would have been unfavorable to the interest of the party refusing. Refusal to submit to blood tests or genetic tests, or both, is also subject to the sanctions within the jurisdiction of the court.
e. Whenever blood tests or genetic tests are ordered and made, the results thereof shall be filed with the court and shall be receivable in evidence, but only in cases where definite exclusion is indicated, or where a human leucocyte antigen, electrophoresis or isoelectric test is made to also establish the positive probability of parentage. Expert testimony pertaining to these tests may be requested by the parties. The order for such blood tests or genetic tests also may direct that the testimony of such experts and the persons so to be examined be taken by deposition. The court, upon application and for good cause shown, may limit the admissibility of the blood tests or genetic tests.
The results of HLA blood tests are admissible, but not conclusive evidence of paternity. See R.K. v. Dept. of Human Services, 215 N.J. Super. 342, 346, 521 A.2d 1319 (App.Div. 1987); see also Assembly Judiciary, Law, Public Safety and Defense Committee Statement, Senate No. 885  L. 1983, c. 17, § 14.
Defendant refused to comply with the court ordered blood test. Following a brief hearing, the Family Part judge held *7 that defendant's refusal would be admitted into evidence at the subsequent trial and would support a presumption that the results of the test would have been unfavorable to his interests. The judge also ordered that defendant be imprisoned until he complied with the statute's requirement and submitted to the blood test. We granted leave to appeal and stayed the Family Part's order.

II.
Initially, we reject defendant's argument that N.J.S.A. 9:17-51 is void for vagueness. Vagueness "is essentially a procedural due process concept grounded in notions of fair play." State v. Lashinsky, 81 N.J. 1, 17, 404 A.2d 1121 (1979); see also Colten v. Kentucky, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584, 590 (1972); Lanzetta v. New Jersey, 306 U.S. 451, 455, 59 S.Ct. 618, 620, 83 L.Ed. 888, 890 (1939). A statute is unconstitutional if it is couched in terms "so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." Coates v. Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214, 217 (1971); see also State v. Cameron, 100 N.J. 586, 591, 498 A.2d 1217 (1985); State v. Lee, 96 N.J. 156, 165, 475 A.2d 31 (1984). The vagueness test "demands that a law be sufficiently clear and precise so that people are given notice and adequate warning of the [statute's] reach." Town Tobacconist v. Kimmelman, 94 N.J. 85, 125 n. 21, 462 A.2d 573 (1983). The question must be resolved against the contextual background of the particular law and with a firm understanding of its purpose. State v. Cameron, 100 N.J. at 591, 498 A.2d 1217.
Measured against these standards, we find no ambiguity in a constitutional sense. Once a party is ordered to undergo a blood test, he has no "right" or "privilege" to refuse. That the statute describes in detail the consequences that may flow from a wrongful refusal, i.e., a negative presumption and perhaps additional sanctions, cannot fairly be translated into according a *8 party the right to decline to submit to court ordered blood testing. A party is legally obliged to obey the court's order. If a wrongful refusal nonetheless eventuates, an adverse presumption necessarily arises from the party's failure to comply.
More troublesome is the statutory language empowering the Family Part to impose "sanctions." N.J.S.A. 9:17-51d. It is unclear whether the Legislature intended to authorize the Family Part to impose penalties for a wrongful refusal, see N.J.S.A. 2A:10-1(c); see also N.J.S.A. 2C:29-9, or whether the design was merely to reinforce the judiciary's inherent right to invoke coercive measures designed to compel a recalcitrant party to comply with a court order, see R. 1:10-5. The Legislature's use of the word "sanctions" is somewhat problematical, particularly because the phrase "civil contempt" is employed in other sections dealing with a party's refusal to comply with the Act's requirements. See, e.g., N.J.S.A. 9:17-50b; N.J.S.A. 9:17-55c.
We need not dwell upon the subject, however. Refusal to comply with a court order falls within the judiciary's inherent contempt power. A contempt of court may be considered an offense against governmental authority, and may be punished criminally. See N.J. Dept. of Health v. Roselle, 34 N.J. 331, 336-338, 169 A.2d 153 (1961). On the other hand, "a proceeding to afford a litigant supplemental relief from an adverse party's failure to obey a court's order is civil...." Board of Educ. v. Educ. Ass'n., 235 N.J. Super. 417, 420, 563 A.2d 55 (App.Div. 1989). In this case, the Family Part's order imprisoning defendant was in the form of relief to a litigant and was thus civil in nature. Defendant does not contend, nor could he, that the Family Part is without the power to incarcerate a party in order to coerce him to comply with a judicial order. The courts clearly have the "inherent power to incarcerate to enforce compliance with their lawful orders...." Acceturo v. Zelinski, 242 N.J. Super. 281, 288, 576 A.2d 900, 904. (App.Div. 1990) See also Spallone v. United States, 493 U.S. ___, ___, 110 S.Ct. 625, 632, 107 L.Ed.2d 644, 655 (1990); Shillitani v. *9 United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535-36, 16 L.Ed.2d 622, 627 (1966); United States v. United States Mine Workers of America, 330 U.S. 258, 330-332, 67 S.Ct. 677, 91 L.Ed. 884, 931-932 (1947); Catena v. Seidl, 68 N.J. 224, 229, 343 A.2d 744 (1975); Catena v. Seidl, 65 N.J. 257, 267, 321 A.2d 225 (1974). Thus, even in the absence of the statutory language in N.J.S.A. 9:17-51d referring to "sanctions," the Family Part would nonetheless have the inherent power to imprison a recalcitrant party who wilfully refuses to comply with a court ordered blood test. See State v. Cary, 49 N.J. 343, 353, 230 A.2d 384 (1967).
Defendant contends, however, that once a party declines to be tested and implicitly agrees to be saddled with the statutorily created negative presumption, his right to take this course cannot further be burdened by imprisonment. We disagree. We are entirely satisfied that the Legislature, by creating a statutory presumption adverse to a party who refuses to undergo a court ordered blood test, did not intend to deprive the judiciary of its inherent contempt power, including the authority to imprison the defiant litigant. See State v. Warren, 186 N.J. Super. 35, 40, 451 A.2d 197 (Law Div. 1982). We do not perceive a legislative intention to grant a defiant party a right to refuse to submit to a blood test. The negative presumption created by N.J.S.A. 9:17-51d does not exhaust the coercive measures the Family Part may impose to insure compliance. The negative presumption and other coercive means, such as imprisonment, were not intended to be mutually exclusive. The simple and overriding fact is that the law "has a right to every man's evidence." United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884, 891 (1950). A litigant should not be permitted to make himself the final arbiter of the availability of his evidence since the court has the inherent authority to compel its production.
We are thus convinced that the Legislature did not intend to deprive the Family Part of a vital means of procuring blood test *10 results, i.e., the contempt power. Our reading of the statute comports with its express language and the Legislature's obvious concern for the protection of the child. It bolsters the general policy of the Act by tending to assure the production of reliable and important evidence. Because the legal sufficiency of a case may depend upon the ability to require blood tests, the judicial capacity to compel their production may be crucial. We find no support for the thesis that the Legislature intended to supplant that power by creating the statutory presumption which appears in N.J.S.A. 9:17-51d.
Although we have found no reported New Jersey opinion dealing with the precise issue, decisions in other jurisdictions support the conclusion we have reached.[1]See, e.g., Eagan v. Ayd, 313 Md. 265, 271-80, 545 A.2d 55, 58-61 (Md. 1988); In re Paternity of D.A.A.P., 117 Wis.2d 120, 127, 344 N.W.2d 200, 204 (App.Ct. 1983). So construed, we find no merit in defendant's contention that the statute is void for vagueness. Certainly, the statute was sufficiently clear to provide defendant with adequate warning that if he refused court ordered blood testing he was subject to an adverse presumption as well as "sanctions within the jurisdiction of the court." Defendant was fully apprised of the consequences of his failure to comply with the court's order. Before he was exposed to any risk or detriment, the impact of N.J.S.A. 9:17-51d was made fully known to him. He has no cause to complain.

III.
We agree with defendant's argument that court ordered blood tests are searches within the meaning of the *11 Fourth Amendment. In Schmerber v. California, 384 U.S. 757, 772, 86 S.Ct. 1826, 1836-37, 16 L.Ed.2d 908, 920 (1966), the United States Supreme Court recognized that because blood testing requires an intrusion into the body of a defendant, the Fourth Amendment requires that it be supported by probable cause. Ibid. Although Schmerber was a criminal case, the Court has since held that the constraints of the Fourth Amendment apply in the civil context as well. See Treasury Employees v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); Marshall v. Barlow's Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).
The touchstone of Fourth Amendment analysis is that all governmental searches be reasonable. Unreasonable searches are those which are "not justified in the circumstances or which are made in an improper manner." Schmerber v. California, 384 U.S. at 768, 86 S.Ct. at 1834, 16 L.Ed.2d at 918. In the context of the criminal law, a search must be supported, as a general rule, by a warrant issued upon probable cause. See, e.g., Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). However, recent decisions have reaffirmed the long standing principle that neither a warrant nor probable cause is an indispensable component of reasonableness in every circumstance. See, e.g., Skinner v. Railway Labor Exec. Assn., 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639, 664 (1989); Treasury Employees v. Von Raab, 489 U.S. at ___, 109 S.Ct. at 1390-91, 103 L.Ed.2d at 702; New Jersey v. T.L.O., 469 U.S. 325, 342 n. 8, 105 S.Ct. 733, 743 n. 8, 83 L.Ed.2d 720, 735 n. 8 (1985); United States v. Martinez-Fuerte, 428 U.S. 543, 556-561, 96 S.Ct. 3074, 3082-85, 49 L.Ed.2d 1116, 1127-30 (1976). Where a Fourth Amendment intrusion serves special governmental needs beyond those normally attendant to law enforcement, it is necessary to balance the individual's privacy expectations against the goal sought to be achieved. Treasury Employees v. Von Raab, 489 U.S. at ___, 109 S.Ct. at 1390-91, 103 L.Ed.2d at 702. In that context, the probable cause standard "is peculiarly related to criminal investigations," Colorado *12 v. Bertine, 479 U.S. 367, 371, 107 S.Ct. 738, 741, 93 L.Ed.2d 739, 745 (1978), quoting South Dakota v. Opperman, 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 3097 n. 5, 49 L.Ed.2d 1000, 1006 (1976), and, in our view, is generally unhelpful in analyzing the reasonableness of blood testing to determine parentage.
We stress that the public has a compelling interest in ensuring and protecting the interests of children. There is a strong societal reason to uphold measures reasonably tailored to the need to determine parentage. It is clearly within the power of the State to provide for the enforcement of the parental duty to support one's children. Such laudable efforts are designed to prevent custodial parents from having to bear alone the burden of a mutual decision to engage in sexual relations.
Against these valid public interests we must weigh the interference with individual liberty that blood testing entails. We do not minimize a defendant's privacy expectations and interests in the integrity of his or her body. In determining a putative father's parentage, we are thus persuaded that there should be some reasonable quantum of individualized suspicion to support court ordered blood testing. Stated another way, the plaintiff should be required to show, as a prerequisite to court ordered blood tests, that there is an articulable reason for suspecting the defendant is the father.
We reiterate that we are not requiring a finding of probable cause. A paternity case is not criminal and a defendant should not be afforded a full panoply of criminal procedural protections. However, as a general rule, something more than the filing of a complaint containing highly conclusory allegations is necessary when the defendant denies paternity. While several decisions in other jurisdictions have required a full adversarial hearing, see, e.g., Rose v. Dist. Court of Eighth Judicial Dist., 628 P.2d 662 (Mont. 1981); State v. Meacham, 93 Wash.2d 735, 612 P.2d 795 (Wash. 1980), we are of the view that documentary submissions may be sufficient.
*13 N.J.S.A. 9:17-48 provides the appropriate statutory framework within which questions relating to blood testing should be addressed. That statute requires that a "consent conference" be conducted "[a]s soon as practicable" after a paternity complaint has been filed. Among other provisions, the statute states that "the court may require the parties to submit to blood tests or genetic tests." N.J.S.A. 9:17-48d. A request for blood tests should be made at the pretrial conference accompanied by either documentary submissions or testimony sufficient to enable the court to determine whether there is an articulable reason for suspecting that the defendant is the father. If the movant satisfies this threshold standard the court should enter an order directing that blood tests be taken.
We recognize that N.J.S.A. 9:17-51a does not expressly require a preliminary finding be made as the predicate to court ordered blood testing. However, we are convinced that such a showing is a constitutional imperative. While other jurisdictions have differed concerning the appropriate standard and procedure to be followed, they are virtually unanimous in requiring the movant to satisfy some type of threshold standard before blood tests can be ordered. See Commonwealth v. Beausoleil, 397 Mass. 206, 490 N.E.2d 788 (Mass. 1986); Bowerman v. McDonald, 157 Mich. App. 368, 403 N.W.2d 140 (Mich. App. 1987); Albany County Dep't. of Social Serv. v. Seeberger, 112 A.D.2d 674, 492 N.Y.S.2d 182 (N.Y.A.D. 1985); State v. Meacham, 93 Wash.2d at 735, 612 P.2d at 795; Matter of Commissioner of Social Servs. of County of Erie v. O'Neil, 94 A.D.2d 480, 464 N.Y.S.2d 889 (N.Y.A.D. 1983). There is thus nothing unusual about our statutory construction. When a statute's constitutionality is doubtful, "a court has the power to engage in `judicial surgery' and through appropriate construction restore the [law] to health." Town Tobacconist v. Kimmelman, 94 N.J. at 104, 462 A.2d 573. See also New Jersey Chamber of Commerce v. New Jersey Elec. Law Enforce. Comm'n., 82 N.J. 57, 75, 411 A.2d 168 (1980); Borough of Collingswood v. Ringgold, 66 N.J. 350, 357, 331 A.2d 262 *14 (1975), app. dism. 426 U.S. 901, 96 S.Ct. 2220, 48 L.Ed.2d 826 (1976); State v. De Santis, 65 N.J. 462, 472-473, 323 A.2d 489 (1974). That is the course we have chosen here.

IV.
We now apply the principles we have described to the facts of this case. We are constrained to reverse the Family Part's order. Plaintiff failed to establish, through documentary submissions or testimony, an articulable suspicion defendant is the father of her child. Although plaintiff invites us to exercise our original jurisdiction under R. 2:10-5 and make such a finding, the paltry record submitted to us is generally uninformative and, thus, inadequate for this purpose. Instead, the matter is remanded to the Family Part for proceedings consistent with this opinion.
In light of our disposition, we do not reach the question whether defendant was properly imprisoned by reason of his refusal to comply with the court's order. We do not know whether, on remand, a blood test will be ordered. Should the Family Part grant plaintiff's motion, we do not anticipate that defendant's defiant refusal to obey the court's order will be repeated.
We note the limited contours of our opinion in that respect. We have held in this case that the Family Part may incarcerate a litigant who refuses to submit to an order directing that a blood test be performed and that such refusal gives rise to a negative presumption the results would have been unfavorable to his interests. We emphasize that imprisonment is an available remedy, but not the sole coercive measure that can or should be invoked to compel compliance. Because incarceration is a drastic curtailment of the defendant's liberty interest, resort to this means of compelling compliance should, as a matter of public policy, be carefully considered and weighed. We do not suggest that a court is restricted to the least *15 intrusive method of insuring compliance. The question is best left to the Family Part's discretion.
The order of the Family Part is reversed and the matter is remanded for further proceedings consistent with this opinion.
SHEBELL, J.A.D., concurring in part and dissenting in part.
I am unable to agree with my colleagues on two aspects of their opinion. First, I would conclude that it is constitutional, reasonable and clearly contemplated under N.J.S.A. 9:17-51 that an order for blood or genetic testing of a party to a paternity proceeding may be made where the action is commenced by a verified complaint, that is, sworn and subscribed to before a person authorized to administer an oath. That is the case here; thus, to my view, it should be sufficient to satisfy the concern of the majority that there be "an articulable reason for suspecting defendant is the father." Ante at 12, 578 A.2d at 386. I submit that the majority's suggestion that the request for blood tests "be made at the pretrial conference accompanied by either documentary submissions or testimony sufficient to enable the court to determine whether there is an articulable reason for suspecting that the defendant is the father[]" unnecessarily burdens and delays the proceedings. Ante at 13, 578 A.2d at 387.
N.J.S.A. 9:17-48d contemplates that an order to submit to blood tests or genetic tests may be entered by the court where a party refuses to accept a recommendation for settlement made on the basis of the information produced at a consent conference. This section envisions that blood tests or genetic tests may have been already available at the consent conference so that a court may not even be required to enter an order to compel testing. Requiring a preliminary showing beyond a verified complaint may well have the effect of deterring putative fathers from consenting to testing at an early stage in the proceedings, thereby rendering most consent conferences ineffective *16 as a vehicle for reaching consent agreements without the need for additional court conferences and trials.
I agree with the majority position in the instance where the man against whom the verified complaint is signed then attempts to allege that another man is the father of the child and the court order is then directed against the latter individual. In such circumstances, the additional man is to be made a party to the action. See N.J.S.A. 9:17-50e. In this situation there will not be a verified complaint against the additional party, and therefore, there should be either a documentary submission under oath or testimony to enable the court to determine whether out-of-court testing of that individual is appropriate. Indeed, under N.J.S.A. 9:17-50e, testimony as to sexual intercourse between the other man and the mother is not even admissible unless the other man has undergone blood tests or genetic tests which do not exclude the possibility of his paternity of the child. There is a clear legislative intent in these circumstances to prevent scurrilous accusations and contrived evidence by the putative father named in the original verified complaint.
My second area of disagreement is with what appears to be the majority's approval of a policy that will encourage incarceration to coerce compliance with court orders for blood or genetic tests. The Legislature has declared:
The refusal to submit to blood tests or genetic tests, or both, may be admitted into evidence and shall give rise to the presumption that the results of the tests would have been unfavorable to the interest of the party refusing. Refusal to submit to blood tests or genetic tests, or both, is also subject to the sanctions within the jurisdiction of the court. [N.J.S.A. 9:17-51d].
I agree that there is nothing in this legislative enactment which would preclude the court from exercising its inherent power to incarcerate as a means of coercing compliance with its order; however, I believe it is apparent that if the Legislature had thought such judicial action were warranted as routine protocol, it would have specifically so provided. Instead, the Legislature has made specific reference to the consequences of *17 refusal to submit to testing. Very simply, the refusing party accepts the statutory consequence of a presumption that the results of the test would have been unfavorable. N.J.S.A. 9:17-51d.
If a defendant is willing to proceed subject to that detriment, then I see no valid reason in the absence of extraordinary circumstances why the court should undertake to incarcerate him in order to coerce compliance. It is unnecessary and will promote delay. Furthermore, it is unduly expensive, uses much needed jail space, gives the appearance of unreasonable and excessive use of judicial power, and can result in grave emotional and economic hardship to the party and his dependents. Further, as defendant here has noted, there may be personal health and safety concerns in submitting to blood testing. If a defendant is willing to accept the adverse presumption, a court should defer to his election to refuse testing.
The mere fact that the court has the power to incarcerate to coerce compliance with its order does not mean that the use of that power should be encouraged. The Legislature's reference to a person who refuses to submit to testing as being "also subject to the sanctions within the jurisdictions of the court[,]" in my view refers to punishing for the contempt which is a consequence of the party's refusal to obey the court's order. See N.J.S.A. 2A:10-1(c); see also N.J.S.A. 2C:29-9. Thus, a court may find a party in civil contempt and impose a fine pursuant to N.J.S.A. 2A:10-5. The court may choose to initiate a criminal proceeding pursuant to N.J.S.A. 2C:29-9; however, if a criminal action is brought a defendant is entitled to all due procedural and constitutional protections, including indictment and jury trial. However, a court may not impose a sanction or punishment under the guise of a coercive order. It is a firm principle of law that an order for incarceration to bring about coercive compliance is not a sanction and may not be imposed to punish, nor may it remain in effect once it has lost its coercive effect. See Acceturo v. Zelinski, 242 N.J. Super. 281, 576 A.2d 900 (App.Div. 1990); see also Shillitani v. United States, 384 *18 U.S. 364, 370, 86 S.Ct. 1531, 1535-36, 16 L.Ed.2d 622, 627 (1966); Catena v. Seidl (Catena I), 65 N.J. 257, 262, 321 A.2d 225 (1974).
The majority's reference to State v. Cary, 49 N.J. 343, 230 A.2d 384 (1967), ante at 9, 578 A.2d at 385, is an inappropriate measure of the proper policy considerations to be weighed by this court as defendant in Cary was charged with murder. The opinion considered his arguments of self-incrimination and due process violations in an entirely different context. Likewise, the decision in United States v. Bryan, 339 U.S. 323, 331-32, 70 S.Ct. 724, 730, 94 L.Ed. 884, 891 (1950), see ante at 9, 578 A.2d at 385, dealt with testimonial and documentary evidence and concerned the compelling of such evidence before a congressional committee.
I remain unpersuaded that the courts of this state should adopt a policy which would lead us further into the Acceturo quagmire. I would hold that in these circumstances it was an abuse of discretion to have ordered defendant's incarceration in an attempt to coerce his compliance with the Family Part's order for testing.
NOTES
[1] Although New Jersey has enacted a variation of the Uniform Act on Paternity, the model statute provides no analogue to N.J.S.A. 9:17-51d. Section 7 of the Uniform Act provides that "[i]f any party refuses to submit to [a blood test], the court may resolve the question of paternity against such party or enforce its order if the rights of others and the interests of justice so require." [Emphasis added].